Gregory ALLEN and Nancy J. Allen,
Plaintiffs–Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE CO.,
Defendant–Respondent.

No. 52844.

Missouri Court of Appeals,
Eastern District,
Division One.

June 28, 1988.

Kevin C. Roberts, Hillsboro, for plaintiffs-appellants.

Scott C. Harper, Clayton, for defendant-respondent.

PER CURIAM.

This is an action by insureds on an automobile insurance policy to recover for losses resulting from the theft of a covered vehicle. In addition to actual damages and interest, plaintiffs sought a penalty and attorney fees because of defendant's alleged vexatious refusal to pay their claim. §§ 375.296 and 375.420, RSMo 1986. The jury awarded plaintiffs $1,000 actual damages; $90 interest; $200 as a penalty; and $4,550 in attorney fees. The trial court sustained defendant's motion for judgment notwithstanding the verdict on the claims for the penalty and attorney fees.[1] Plaintiffs appeal; we reverse and remand.

Plaintiffs' evidence consisted primarily of the testimony of Gregory Allen who stated that on June 19, 1984, he obtained a ride to work with fellow employee Ray Laurent, leaving home between 6:30 and 6:45 a.m. At that time the Allen's 1978 Jeep Wago-

1. Defendant did not file a motion for a directed verdict at the end of plaintiffs' case but did file a motion for a directed verdict, limited to the issue of vexatious refusal to pay, at the end of all the evidence.

neer was parked across the street from their mobile home. After returning home from work, again riding with Laurent, Allen drove the Jeep to a K–Mart store in Arnold to purchase various items including motor oil for an oil change for the Jeep. He parked the Jeep on the parking lot around 5:45 p.m. He locked the vehicle, although the lock on one door did not work, and took his keys with him. Allen had one of two sets of keys to the Jeep; his wife had the other. Allen was in the K–Mart about 15 minutes; when he returned to the parking lot, the Jeep was gone. When he walked to the Arnold Police Station, about one block away, to report the theft, Arnold Police Detective Carl Cullum asked him to take a lie detector test which he refused.

The next morning, June 20, Allen informed his insurance agent of the theft. Later that morning, Robert Newman, defendant's investigator, telephoned Allen at work and took a statement from him. That afternoon, Newman called Allen to inform him that the Jeep was "in the [St. Louis] city junk yard or impound yard...." When Allen recovered his vehicle a day or two later, it had tires and wheels different from those on it prior to the theft, and one hub cap was missing, as was a variety of special equipment used by Allen in his work as a volunteer fireman.

On the 23rd or 24th of June the Allens received a letter, dated June 22, from Newman which stated in pertinent part: "I have completed sufficient investigation to have determined that this claim does not qualify as a theft loss under the terms of your policy." Nancy Allen testified she was never contacted by defendant's investigator Newman and that her husband had obtained a ride to and from work with Laurent on the 19th. During defendant's case, plaintiffs offered and the court received into evidence defendant's activity log concerning the Allens' claim. After an initial entry by a secretary on June 20, 1984, the log contains entries indicating that on June 20 Newman took Allen's statement and on June 21 he inspected the recovered vehicle and sent his denial letter. There was no evidence in the log of any additional activity by Newman on the Allens' claim after June 21.

Defendant's evidence consisted of testimony from Gregory Allen's co-worker, Laurent; Detective Walter Waggoner of the Auto Theft Section of the St. Louis Metropolitan Police Department; Detective Cullum; defendant's investigator Newman; and the deposition of Elvoid Brooksher.

Laurent testified that Gregory Allen had ridden to and from work with him on the 19th. Although he did not see the Jeep in the Allens' driveway, he stated he did not look across the street where Allen testified it was parked.

Detective Waggoner testified about a raid on the "Carco" lot, a suspected "chop shop" in St. Louis, about 10:45 p.m., on June 19. The Allens' Jeep was found on the Carco lot, next to a building in a locked, fenced-in area. Three other stolen vehicles also were on the lot. The rear license plate was inside the Jeep, and Waggoner saw a key in the ignition. Waggoner testified that the owner of the Carco lot, Norvel Staat, having been advised of his Miranda rights, told him on the 20th the Jeep had been brought to his property at approximately 7:15 a.m. on June 19 to have rust and body work done on it. Staat said his son-in-law, Michael James Harper, had received the Jeep, but Staat could produce no records for Waggoner. Staat claimed that at approximately 4:40 p.m. on the 19th the vehicle was put in the locked enclosure and the business was closed for the day. Two days later, Staat was arrested and charged with receiving stolen property. Harper refused to make a statement to Waggoner. On the 20th or 21st Waggoner talked to Brooksher who told him he saw a Jeep Wagoneer at the Carco lot on the morning of the 19th. Waggoner stated the Carco lot had not been under 24–hour surveillance nor had it been under surveillance on the 19th from 4:40 p.m. until 10:45 p.m. when police entered with a search warrant.

Arnold Police Detective Cullum said when he asked Gregory Allen to submit to a polygraph test when he reported the theft on June 19, he became "very upset." Cullum testified it was "standard proce-

dure" to request him to take the lie detector test. On the morning of the 20th Detective Waggoner called Cullum to tell him the Allens' Jeep had been recovered. That evening, Cullum again questioned Gregory Allen at the Arnold Police Station. When Cullum confronted him with information that the Jeep had been recovered during the raid at Carco, Allen became "upset" but insisted the account he gave Cullum on the 19th was true. Cullum again asked Allen to take a polygraph test, but he refused. Neither Cullum nor Waggoner, nor any other police officer, testified that Newman had talked to them.

The deposition of Elvoid Brooksher was read to the jury. When the deposition was taken October 29, 1986,[2] Brooksher was in the Missouri Work House in St. Louis, apparently serving time on a driving while intoxicated conviction. Brooksher, in testimony refreshed by use of a police report, said he lived across the street from the Carco lot in June 1984 and was permitted by Carco operator Staat to work there on his own vehicle. Brooksher saw a Jeep "wagon" on the street in front of the lot around 7:00 a.m. on June 19 and there were keys in the ignition. Later that day, Brooksher saw the vehicle in a fenced-in area next to the "garage" on the Carco lot.

The testimony of defendant's investigator Newman is particularly significant because, on the issue of vexatious refusal to pay, Newman's testimony and his activity log supplied most, if not all, of the evidence concerning the extent of defendant's investigation and the facts as they appeared to defendant at the time of the refusal to pay. Newman, who had performed auto theft and fraud investigations for defendant for 27 years, testified he took a 12–page statement from Gregory Allen over the telephone at 11:30 a.m., June 20, the day after Allen reported the theft to Arnold police. Newman said Allen was cooperative and answered all his questions. On the 21st Newman inspected and photographed the recovered vehicle at the city tow lot, spoke to one or more police officers by telephone, and dictated his letter (dated June 22) to the Allens denying their claim.

Concerning his inspection of the Jeep, Newman testified he found no evidence of forced entry, no damage to the steering column or ignition lock, and no evidence of hot-wiring. Three of the four hubcaps were on the vehicle and a spare tire was in the rear. All lug nuts were in place and did not appear to Newman to have been removed "within the last four or five, six days." Newman said "usually when someone steals tires and wheels, they don't put the lug nuts back on. Not all of them." Newman said the dipstick indicated the oil was two quarts low and it was "very dirty." A service sticker on the door indicated the oil had been changed April 29, 1984, and the Jeep had been driven about 2,200 miles since that date. At the time of his inspection, Newman did not know there was a key in the Jeep's ignition when the police raided the Carco lot.

The police information Newman said he relied on when he made his decision on June 21 to deny the claim was that the Jeep was on the Carco lot at 4:30 or 5:00 p.m. on June 19 when the lot was closed and locked for the day and that St. Louis police entered with a search warrant sometime in the evening of June 19. From this he concluded the vehicle could not have been on the K–Mart lot at 6:00 p.m. Newman also said he was "a little interested in the fact that [Gregory Allen] refused to take a polygraph." All the information was obtained by telephone; Newman did not receive written reports from the St. Louis and Arnold police departments until after the June 22 denial, although, Newman stated, he had "some knowledge of what existed."

Newman said his denial also was influenced by portions of Gregory Allen's statement. "[T]here were some things in the original statement that bothered me, a few little things. Like when I asked what kind of tires he had on the vehicle, he said 'Firestone.' But he didn't remember where he bought them. I thought that was unusual that a person didn't remember where

2. The petition was filed June 11, 1985; the case was tried November 25 and 26, 1986.

they purchased their tires. Just the rest of the statement appeared to be pretty much in order. I don't think there was much about the statement that bothered me except that one sentence in the statement that bothered me a little bit." Asked by defense counsel what else he relied on, he said, "Well, I didn't believe him. I didn't believe what he was saying. I felt that the car was located at Carco at the time he said it was located at K–Mart." Referring to Gregory Allen's assertion in his statement that the Jeep was in "mint condition," Newman stated, "[I]t's a little unusual for a car or vehicle with 80,000 miles on it that is six years old to be in mint condition." Newman also said Allen had given conflicting information about whether his wife and children were home when he returned from work on the 19th. Asked if he relied on anything else, he replied, "That was about it."

After sending the June 22 denial letter, Newman learned that Carco operator Norvel Staat said the Jeep had been delivered to the lot at 7:15 a.m. June 19, that Staat's son-in-law Harper had accepted the vehicle, and that the Jeep was in a fenced-in portion of the lot and had a key in the ignition at the time of the police raid; he learned of the existence of Brooksher and that Brooksher corroborated Staat's story that the Jeep was on the Carco lot on the morning and afternoon of the 19th; and he learned from Cullum that the Arnold police had reclassified the theft report as "unfounded," although Newman did not say Arnold police gave him any reason for the reclassification. Newman testified he had told Cullum earlier, "I thought it was a case of fraud."

On cross-examination, Newman admitted that by the time he received the written police reports he knew stolen vehicles had been removed from the Carco lot and that Staat had been arrested and charged with receiving stolen property. Newman also admitted he was never able to verify that the Carco lot had been under surveillance prior to the police raid. He said his conclusion that no one entered the lot after closing time on the 19th was based solely on Staat's statement. After sending the June 22 letter and being contacted by the Allens, Newman still never talked to Nancy Allen nor did he take a second statement from Gregory Allen or ask him to clarify the statement he gave on the 20th, although he reviewed Allen's statement "several times." Newman said he tried to contact Norvel Staat, the owner of the Carco lot on June 21, but Staat was not cooperative, and on June 21 he could not locate Staat's son-in-law, Michael Harper. There was no evidence Newman made any attempt subsequent to June 21 to contact Staat or Harper and no evidence Newman made any attempt to contact Brooksher. Defendant's first contact with Brooksher appears to have been after suit was filed. There was no evidence Newman talked to Gregory Allen's co-worker Laurent or to Allen's supervisor at work. He admitted that Gregory Allen told him at least one window on the Jeep was "cracked" or slightly open when parked on the K–Mart lot and that a thief would not have needed to break a window to open a door on the vehicle.

Newman said that after the June 22 denial letter, the Allens contacted him "several times" concerning their claim. He also recalled being contacted by an attorney for the Allens and said he thought the Allens had requested "a letter from me outlining in greater detail why I denied the claim." In his testimony, Newman referred to his subsequent correspondence to the Allens. On July 9, 1984, he notified the Allens that insurance regulations permitted defendant an additional 45 days to complete its investigation. The letter then stated:

> We are investigating to determine if this incident qualifies as a "LOSS" as defined by the policy. In other words, we have to determine if this was the actual theft of a motor vehicle, and if it was a theft loss, the theft occurred in the manner described in the police report and in the statement given to the insurance company.

On October 15, 1984, Newman wrote the Allens:

> I have completed sufficient investigation to have determined that this claim does not qualify as a theft loss under the

terms of your Policy. It is my understanding that you desire to file suit, and I would like to advise you that your vehicle was found at Carco's 2645 Pestalozzi, St. Louis, Mo. The parties operating that company are Norvel and Joseph Staat. residing at 1140 Dammert, Lemay, MO, and Michael James Harper, residing at 4810 E. Swaller Road, Imperial, MO. [The letter then listed seven police officers who conducted investigation "regarding this incident."]

Under the circumstances, we will not make any voluntary payment regarding this claim.

On May 14, 1985, in response to a letter from the Allens containing an itemized list of articles missing from the Jeep, Newman wrote: "As I indicated in my letter of October 15, 1984, it is our opinion that this claim does not qualify as a theft loss under the terms of your policy. In other words, I don't believe that a theft loss occurred in this particular case."

In reviewing a trial court's order of a judgment n.o.v., an appellate court considers the evidence and reasonable inferences favorable to the jury verdict and disregards evidence that does not support the verdict. *McCulley v. State Farm Mutual Automobile Insurance Co.*, 668 S.W.2d 121, 122 (Mo.App.1984). The appellate court must consider the moving party's evidence if it supports the verdict. *Bayne v. Jenkins*, 593 S.W.2d 519, 521 (Mo. banc 1980). A judgment n.o.v. is a drastic action that should be granted only when reasonable and honest persons could not differ on the correct disposition of the case. *Jarrell v. Fort Worth Steel and Manufacturing Co.*, 666 S.W.2d 828, 833 (Mo.App.1984); *see Vinson v. Vinson*, 725 S.W.2d 121, 123 (Mo.App.1987) (granting a judgment n.o.v. is the equivalent of directing a verdict at the close of the evidence).

The law is well-settled that for an insured to obtain a penalty and attorney fees under §§ 375.296 and 375.420, RSMo 1986, he must show that the insurer's refusal to pay the loss was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person. *DeWitt v. American Family Mutual Insurance Co.*, 667 S.W.2d 700, 710 (Mo. banc 1984), citing *Groves v. State Farm Mutual Automobile Insurance Co.*, 540 S.W.2d 39, 42 (Mo. banc 1976). Analyzing the evidence required to show vexatiousness, Judge Smith, writing for our court in *Hester v. American Family Mutual Insurance Co.*, 733 S.W.2d 1 (Mo.App.1987), observed,

In recent years the standard necessary to support a vexatiousness award has been relaxed. The present test is stated as follows in [*DeWitt*].

The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant.... Direct and specific evidence to show vexatious refusal is not required, the jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case.

733 S.W.2d at 2, *quoting DeWitt*, 667 S.W.2d at 710.

■ Appellate court opinions of this state provide numerous examples of evidence of vexatiousness. A refusal to pay based on a suspicion that is unsupported by substantial facts is vexatious. *Laster v. State Farm Fire and Casualty Co.*, 693 S.W.2d 195, 197 (Mo.App.1985). The adequacy of an insurer's investigation of a claim may be considered evidence of vexatiousness. *DeWitt*, 667 S.W.2d at 710. The denial of liability without stating any ground for denial is sufficient to warrant the submission of vexatious damages. *Berry v. Federal Kemper Insurance Co.*, 621 S.W.2d 948, 954 (Mo.App.1981). Based on all the facts and circumstances of this case, we believe there was sufficient evidence to submit to the jury the question whether defendant's refusal to pay was without reasonable cause or whether its attitude was vexatious and recalcitrant.

The day after notification of the claim, defendant's investigator had decided to deny it, a denial based on his inspection of the Jeep, a statement from Gregory Allen

about which the investigator's chief complaint was that Allen could not remember where he bought his tires, telephone communication with one or more law enforcement officials concerning an incomplete police investigation, and Gregory Allen's refusal to take a lie detector test. We do not believe this evidence supplies the "substantial facts" necessary to support the apparent suspicion harbored by defendant's investigator Newman when he decided to deny the claim. While circumstances might exist that would justify a request that a person reporting a theft submit to a lie detector test, we believe Gregory Allen's initial reaction of being "upset" and refusing the test was understandable and reasonable.

Evidence that came to Newman's attention after he initially decided to deny the claim does not aid defendant's position. Newman learned that other stolen vehicles were recovered from the Carco lot and that lot operator Staat was charged with receiving stolen property. Newman also learned it was erroneous to believe that no one could have entered the Carco lot undetected from 4:30 p.m. until 10:45 p.m. on June 19. Almost one year elapsed from notification of the loss to the filing of the lawsuit June 11, 1985; however, the evidence reveals little on-going investigation by defendant. Although Newman's letter of October 15, 1984, indicates he knew how to contact Staat and Harper, there is no evidence he attempted to do so after June 21, 1984, to lend support to defendant's theory that the Jeep was on the Carco lot at the time Gregory Allen said it was on the K–Mart lot. An inquiry of Gregory Allen's co-worker Laurent would have revealed that Allen was with him at the very time Staat claimed the Jeep was brought to his business, and defendant apparently waited until after suit was filed to contact Brooksher, who supplied the only non-hearsay evidence at trial that a Jeep had been on the Carco lot during the day on the 19th. Newman did not contact Nancy Allen and did not seek additional information from Gregory Allen. There were no substantial facts to elevate defendant's suspicion to a reasonable belief. *See Travelers Indemni-*

*ty Co. v. Woods,* 663 S.W.2d 392, 397 (Mo. App.1983).

Circumstances certainly exist where investigations conducted by others, combined with an insurance company's own are sufficient to give defendant a reasonable basis to believe that a claimant has no coverage. *See, e.g., Francka v. Fire Insurance Exchange,* 668 S.W.2d 189, 190 (Mo.App. 1984). Here, however, Newman's investigation, combined with the investigations of the various police agencies involved, did not provide substantial facts on which Newman could base his suspicions, and the question of defendant's alleged vexatious refusal to pay was for the jury. *Travelers Indemnity,* 663 S.W.2d at 397. This is especially true in light of the limited efforts by Newman as shown in defendant's activity log. *See Laster,* 693 S.W.2d at 197 (insurance company's contact with insured concerning policy claim not recorded in file).

Newman's letters to the Allens provide additional evidence of defendant's vexatiousness. The letters simply stated "[T]his claim does not qualify as a theft loss under the terms of your policy." There is no evidence defendant ever informed Allens of the grounds for this conclusion. *See Berry,* 621 S.W.2d at 954 (insurance company gave no reason for denying claim other than "lack of an insurable interest"). This is not like the situation in *Francka* where the defendant insurance company explained its conclusion in its denial letter. 668 S.W.2d at 190.

The order of the trial court granting judgment n.o.v. on the penalty and attorney fees award is reversed and the cause is remanded with instructions to reinstate the verdict of the jury.