Shelia Sturgeon RUSSELL,
Plaintiff–Respondent,

v.

FARMERS & MERCHANTS
INSURANCE COMPANY,
Defendant–Appellant.

No. 17750.

Missouri Court of Appeals,
Southern District,
Division Two.

June 9, 1992.

Michael H. Maguire, Lowes & Drusch, Cape Girardeau, for defendant-appellant.

Jim S. Greene, Sikeston, for plaintiff-respondent.

SHRUM, Presiding Judge.

The plaintiff Shelia Sturgeon Russell sued the defendant Farmers & Merchants Insurance Company claiming she had suffered a personal property loss that was insured under the defendant's homeowners policy issued to her and her former husband. Pursuant to a jury verdict the trial court entered judgment for the plaintiff: $17,157.78 theft loss; $1,550 interest; $2,020.20 penalty for vexatious refusal to pay; $7,500 attorney fees.

The defendant appeals. We reverse the award of attorney fees; in all other respects we affirm the judgment.

## FACTS

In late January 1987, the plaintiff's residence in Sikeston, Missouri, was burglarized, and a large quantity of personal property was taken or destroyed. The defendant's policy, covering the plaintiff's home, included coverage for loss of personal property due to theft and vandalism. The policy was initially effective July 1, 1986, and was in force on the date the loss occurred. The named insureds were the plaintiff and her husband Phillip Sturgeon.[1]

In the midst of marital discord, Phillip moved out of the home on November 13, 1986, leaving the plaintiff and their three minor children in possession of the home and its contents. Both Phillip and the plaintiff testified that considerable animosity surrounded their separation and ultimate divorce.

The plaintiff testified that she spent most the day on January 30 "in divorce court." Because she was upset over a postponement of the dissolution, several of her friends offered to take her out for the evening. She left home about dark, took her children to stay with her mother, and did not return home until approximately 1:30 a.m., January 31, at which time she found the home and a shed on the premises had been entered forcibly. Substantial amounts of personal property had been removed from both buildings and some vandalism had occurred. Sikeston police and the defendant were notified; each entity initiated investigations.

Lt. Dan Armour investigated the burglary and theft for the Sikeston police. He provided information, including copies of statements from persons he interviewed, to the defendant's investigator. Armour suspected the plaintiff was involved in the perpetration of the burglary and theft, and he expressed his suspicions to the defendant's investigator. From the exhibits on file and Armour's testimony, it appears his investigation was confined to January and

February 1987. At trial Armour said the crime remained unsolved and no arrests were ever made.

On February 13, Patrick Hillman, an employee of General Adjustment Bureau (GAB), an independent adjusting firm hired by the defendant to investigate the plaintiff's claim, provided the plaintiff with inventory forms on which to list missing and damaged items. Because the plaintiff was unsure of what items were missing from the shed and their value, she asked her son to enlist the aid of her estranged husband Phillip in identifying and valuing those items. The plaintiff testified:

> And then when it come to the shed, as I said before, I couldn't get along with my ex-husband, so my son called him on the phone, and Phillip told him, because *Phillip had come in and took his stuff that he wanted, and what was left was supposed to have been mine. That was our agreement,* so he told Phillip what he had left out there, and then Phillip told me and also he listed it. He gave me the prices and everything of what he could remember that it cost. (Emphasis added.)

The son's name also is Phillip. In the above-quoted testimony, we are uncertain to whom the plaintiff refers by some of her references to *Phillip* and *him* and *he*. However, we believe the import of the testimony to be clear from the italicized portion.

As a part of his investigation, on February 19, 1987, Hillman submitted to the defendant his first report (defendant's exhibit E), in which Hillman stated:

> As advised we have six pages of inventory completed by Shelia Sturgeon and we will be meeting with Phillip Sturgeon to verify that the items were actually in the home at the time of the alleged burglary.
>
> As soon as that is completed we will be forwarding a blank proof of loss to Shelia Sturgeon.

---

1. Phillip testified that he and the plaintiff were divorced on May 22, 1987.

The six-page inventory completed by the plaintiff contains 96 separate entries of items of personal property. One of the six inventory pages, which has the hand-written designation "Paul–Lisa" at the top, contains nine entries, including a three-wheel vehicle valued at $2827.46. The three-wheeler was recovered February 17. The total value of all items on the six-page inventory, excluding the recovered three-wheeler, is $17,157.10.

After the plaintiff completed the inventory, Hillman met with Phillip who reviewed the six-page list. Phillip questioned the age of numerous listed items, he identified a ring that he said was lost prior to the burglary, and he noted several items (a comforter, a camera, and five household appliances) that he had "never seen" at the house.[2]

On March 23, 1987, Hillman submitted to the defendant his second report (defendant's exhibit F) accompanied by four enclosures, two of which are described in the report as "Proof of loss filled out by the insured, Phillip and Shelia Sturgeon" and "Six pages of inventory checked out by Phillip Sturgeon."

The proof of loss form, dated March 5, 1987, names "Phillip & Shelia Sturgeon" as the "insured." The form bears the signatures of the plaintiff and Phillip and an acknowledgement by a notary public. On the proof of loss form, the plaintiff and Phillip claimed a total loss of $17,157.78, an amount sixty-eight cents more than the total value of items on the plaintiff's inventory, excluding the three-wheeler. The proof of loss form included this statement: "The property insured belonged at the time of the loss, to Shelia Sturgeon and no other person or persons had any interest therein except Paul Russell—Lisa Coatney."[3]

The defendant, by its claims attorney Richard Carroll, denied the claim in a de-

tailed six-page letter addressed to the plaintiff and Phillip and dated August 14, 1987. A return of premium was tendered with the letter. In the letter, the defendant set out five reasons for its action. First, the defendant charged that the plaintiff and Phillip had engaged in material concealment, specifically, that they had "lied not only on your application for homeowners insurance coverage with this company, but you have continued to perpetrate a fraud on this company by lying on your proof of loss and inventory forms." We quote portions of the denial letter that deal with the application:

> Our investigation has revealed several material misrepresentations made by you with respect to prior losses.
>
> For example, on question 18 on page 1 of the application, you left blank the space asking for "Applicant's loss record past three years (on this or any other property)?"
>
> Likewise, question 2 on page 2 of the application asks "How many fire losses has applicant or any member of applicant's household had?" You answered "None." Question 3 on page 2 of the application asks for "Applicant's loss record on other than fire losses for the past three years on this or any other property?" The answer space there is left blank.
>
> In truth and in fact, you had made <u>three prior claims</u> within the three year period covered by the application!
>
> . . . .
>
> In short, you deliberately lied to procure insurance coverage.... Based upon these material misrepresentations, we have elected to declare this policy void from its inception.... (Underscoring in original.)

Before stating the other reasons cited by the defendant in its letter for denying the

---

**2.** Phillip admitted at trial that the last time prior to the burglary he was in the house was "right before Christmas" and that, following the November 1986 separation, when he was in the house he "went through the kitchen and sat in the living room"; he did not go to other parts of the house.

**3.** From trial testimony, we learn that Lisa Coatney, the plaintiff's niece, was living at the plaintiff's home at the time of the burglary and theft. The plaintiff is now married to Paul Russell; there was conflicting testimony about whether he lived at the plaintiff's home at the time of the burglary and theft.

claim, we set out in greater detail evidence concerning the plaintiff and Phillip's application for the homeowners policy. The application appears in the trial court record in two forms. The version of the application referred to in the denial letter was the agent's copy, which was a part of the defendant's exhibit F, adjustor Hillman's second investigation report to the defendant. The answer spaces for the two questions referred in the denial letter are, indeed, blank. All responses to questions on the application are type-written.

The original application, a part of the defendant's trial exhibit A, was used by the defendant's underwriters prior to issuance of the policy. The original appears identical to the agent's copy, with the addition of several notations in red ink supplied by the defendant's underwriting department and by the hand-written response "None" to the two questions referred to in the denial letter as having no answers. One of the defendant's underwriters testified that she did not know who made the hand-written "None" responses; she assumed it was the agent.

The plaintiff apparently applied for the insurance policy sometime in June 1986. Because she and Phillip previously had sustained a $64,840 fire loss and an $18,986 tornado loss at the premises, their existing coverage with another company had been canceled. In shopping for new coverage, the plaintiff called the Ziegenhorn insurance agency of Sikeston. Portions of the plaintiff's testimony regarding completion of the application follow:

> A. (By the plaintiff) ... I talked to a girl over the phone. She asked me a few questions and the price of the insurance was pretty low, so we went ahead ... with Ziegenhorn.
>
> ....

Q. What did you do after you decided that that's who you were going to purchase the insurance from?

A. She asked me a few questions on the phone and told me that I could come by later and bring a check in for the insurance, so that's what me and my husband did.

....

Q. And did you sign an application?

A. Yes, but it was blank.

....

Q. Was there anything on the application.

A. No.

....

Q. Was the document that you signed, did it have any typing on it?

A. No, sir.

....

Q. Did you in any way lie on your application?

A. No, sir.

Q. You answered every question that was asked you; is that correct?

A. Yes, sir.

The plaintiff denied the two hand-written responses "None" on the original application were in her writing. She admitted that answers on the application concerning prior losses were false; she admitted she and Phillip had previously suffered the fire and tornado losses. The plaintiff's testimony that she signed the application in blank was uncontradicted.[4]

In its denial letter, the defendant also asserted that the plaintiff and Phillip's "practice of deceit continued on your inventory forms and proof of loss." The defendant pointed out that the proof of loss form "states that you had never before suffered a burglary, theft or robbery when, in fact, you claimed to have suffered a burglary in January of 1985, where you claimed the loss of a Tappen microwave oven." The

4. A portion of defendant's exhibit G appears to explain, at least in part, why the plaintiff's testimony, that the application was blank when she signed it, went uncontradicted. Adjustor Hillman identified exhibit G as his sixth report to the defendant concerning his investigation. The report, dated March 31, 1987, states in part, "We contacted Beth Pigg a former employee of the Ziegenhorn Agency who had met with your insured, Shelia Sturgeon and had her to sign the application. This secretary has left the Ziegenhorn Agency and she refused to give me a statement in regards to the facts of the application."

defendant also stated it had learned "from several reliable sources, including Mr. Phillip Sturgeon himself" that many of the items on the inventory "were not in the residence at the time of the alleged burglary...."

The letter stated the following additional reasons for denying the claim. We paraphrase in part and quote in part.

(2) The plaintiff and Phillip had not complied with the terms of the policy by their failure "to provide us with bills, receipts and/or other documentation evidencing ownership....

(3) They had refused "to sign the tendered authorization forms for release of medical, tax, and bank records" which would have allowed the defendant "to check for any possible financial motivation that you may have had for 'arranging' this burglary.

"Given the fact that you were admittedly behind on many bills and that Mrs. Sturgeon has not been gainfully employed since at least 1981, there is a valid concern on our part that you either removed items to make it appear as though a burglary had occurred or caused someone else to remove them.

(4) "Our policy expressly excludes from coverage 'loss caused by theft; a. Committed by an insured;' and 'Intentional loss, meaning any loss arising out of any act committed: (1) by or at the direction of an insured ...'

"As a result of these exclusions, your loss would not be covered by the policy, since our investigation has revealed that the alleged burglary was no burglary at all, but an attempt by Shelia Sturgeon, Paul Russell and others to defraud this company.

"Not only do we have witnesses who will testify that Mrs. Sturgeon lied on the inventory sheets and asked her husband to do the same, but we also have neighbors who will testify that they saw Paul Russell loading things into his pickup and hauling them off the day of the alleged burglary.

(5) The letter set our "other items" of evidence that helped persuade the defen-

dant that the burglary and theft was "an inside job."

The letter concluded, "We further invite you to execute the previously submitted authorizations and to make full compliance with all reasonable requests that we make of you. If you choose to do so, we will again reconsider the matter...."

Unsigned copies of the authorization forms referred to in the denial letter were admitted into evidence as the plaintiff's exhibits 6, 7, and 8. One form would have permitted the Internal Revenue Service to release federal income tax returns, one would have allowed release of "any and all" medical information, and the third would have authorized the release of:

any and all information that anyone might have ... concerning my/our past and present condition of well/ill being, my/our past and present employment or earnings record(s), my/our prior and present insurance records of all types and kinds, my/our health records and any and all types of records that relate in any way to my/our mental or physical condition, or my/our prior records of insurance claims or earnings, Workmen's Compensation documents of all types and kinds, any type of government records of any type or kind, whether the same be from any federal agency, state agency or local government agency, any and all bank or other financial records (at any institution whatsoever of any type), or any combination of the same.

Asked if she had signed the authorizations for the defendant, she responded, "I think I took my tax forms, but on the medical and stuff, I was advised [by her attorney] not to." Concerning the defendant's request for "documentation evidencing ownership," the plaintiff testified that she gave the defendant all the requested information she could find and that she advised the defendant that some receipts were not available. The plaintiff said she requested the defendant pay her claim "three or four times."

At trial, Phillip testified that prior to filing the March 5, 1987, proof of loss, the plaintiff asked him to claim some things

that were not his, specifically a three-wheel motorcycle, tools, shotguns, and a sapphire and diamond ring. He said the plaintiff "offered to catch up on my van payments and to pay me for my loss if I would claim these items as mine." Phillip said the plaintiff also offered him "a quick divorce." Phillip admitted that the prior losses omitted from the proof of loss statement were his as well as the plaintiff's.

Sometime after the August 14, 1987, claim denial, Phillip filed a separate claim with the defendant for tools and other items of personal property. Phillip's list of property has 66 entries; the descriptions and assigned values of many items are identical or similar to the descriptions and values of items on the six-page inventory completed by the plaintiff.[5] Phillip's list does not specify the date each item was purchased. At a date not specified, Phillip provided the defendant with information about "finances" and "health history."

By a check dated April 4, 1988, the defendant paid Phillip $4,281 to settle his separate claim. In exchange for the payment, Phillip signed a "Release of All Claims and Agreement" in which he agreed to "cooperate with the [defendant] in any action brought by his former wife, Shelia J. Sturgeon," and stated that all the assertions in the defendant's August 14, 1987, denial letter were true. The plaintiff testified that she was unaware, until "a few months" prior to the May 22, 1991, trial, that the defendant had paid Phillip on his separate claim.

Claims attorney Carroll testified at trial, and portions of his earlier deposition were read into the record. He stated that "based upon the completed investigation up to that point, August 14, when I wrote this letter, this information is false. The application is false." Carroll made it clear that the August 14, 1987, denial letter was directed to both the plaintiff and Phillip, that it was intended to deny all claims under the policy arising from the alleged burglary and theft, and that the allegation of misrepresentations on the application applied to both the plaintiff and Phillip.

Nevertheless, Carroll acknowledged that "later" he decided "to believe Phillip and not [the plaintiff]." In April 1987 the defendant had obtained a sworn statement from Phillip, a statement that does not appear in the record. Based on that statement and "in talking with him," Carroll determined that Phillip was telling the truth.

Concerning the plaintiff and Phillip's failure to provide "bills, receipts and/or other documentation evidencing ownership," Carroll testified, "We asked for receipts, and we were denied those" although "after suit was started ... we were given some receipts, which were purported to be receipts. But at the time we made the decision, I made the decision to deny this claim, we did not have it...."

Nevertheless, Carroll paid Phillip even though he "did not require a bunch of receipts" from him. He said he did not require the documentation from Phillip because he did not believe Phillip was involved in any misrepresentations on the application or the claim. Regarding the plaintiff's claim, Carroll admitted that the defendant's attorney had requested receipts for only 39 of the items on her list, that the plaintiff provided "some" receipts to the defendant's attorney in January 1988 (20 months prior to the September 14, 1989, filing date of her petition), that "there are times when people can't get receipts," and that the defendant had, in the past, paid other claims when it had not received receipts.

Concerning the plaintiff's refusal "to sign the tendered authorization forms for release of medical, tax, and bank records," Carroll said the defendant needed the information "to know motives" and to see "if she had debts...."

---

5. For convenience, we subsequently refer to the six-page inventory completed by the plaintiff and forwarded to the defendant along with the proof of loss statement as "the plaintiff's list."

The inventory completed by Phillip in conjunction with his separate claim will be referred to as "Phillip's list."

## DISCUSSION AND DECISION

### Fraudulent Application

■ We deal first with the defendant's Point II in which it argues that the policy was void from the beginning because its issuance was induced by the plaintiff's misrepresentations on the application about prior losses, which were material because the defendant would not have issued the policy had it known of them. The defendant contends the trial court should have entered judgment for it at the close of the evidence or should have sustained its motion for judgment notwithstanding the verdict.

We disagree. In doing so we need not decide whether the defendant's evidence shows, as a matter of law, that the misrepresentations on the application were material because the defendant's point and argument ignore evidence from which the jury could have concluded that misstatements on the application were not due to the plaintiff's bad faith.

The jury could have concluded that the plaintiff truthfully answered every question she was asked, that she signed a blank application, and that a Ziegenhorn agency employee or an employee of the defendant filled in the application without having asked all of the questions or, having been given truthful answers, inserted false ones—for whatever reason—without the plaintiff's knowledge. Although the jury could have reached such a conclusion based solely on the plaintiff's testimony, such conclusion also is supported by the fact that on the copy of the application obtained from the agent, two questions about the applicant's loss record are left blank, while on the original application, sent to the defendant prior to issuance of the policy, those two questions have the hand-written response "None."

■ When a jury concludes that erroneous information on an application was supplied by someone other than the applicant, without the applicant's knowledge, the general rule is that the defendant waives or is estopped to rely on the false information in order to void the policy. *See, e.g., Farmers*

*Mut. Fire & Lightning Ass'n v. La Vallee,* 501 S.W.2d 69, 74[6–8] (Mo.App.1973); *Western Cas. & Sur. Co. v. Wunderlich,* 447 S.W.2d 1, 3–4[1] (Mo.App.1969); *Sappington v. Central Mut. Ins. Ass'n,* 229 Mo.App. 222, 77 S.W.2d 140, 147[8–9] (1934).

In *La Vallee* an insurance company sought a declaration of its rights under a fire policy. The issue was whether false information on the application about "other insurance" voided the policy. Part of the application was filled out by the insurer's agent in the presence of the insured, Mrs. La Vallee. The remainder of the application was completed by another employee of the insurer out of the presence of the insured. The insured testified she was never asked about other insurance. The insurer's agent testified he asked the question and Mrs. La Vallee told him "No." The trial court resolved the conflicting evidence by believing Mrs. La Vallee, and it refused to void the policy. On appeal, the western district of the court of appeals said:

Deferring to the trial court's acceptance of Mrs. La Vallee's testimony as true, this case does not present a situation where the insured gave false information or was guilty of any misrepresentation of material facts in the application for insurance. The incorrect or false statement ... was incorporated in the application by the agent Ehlert from unknown or imagined sources, but not from any information furnished him by La Vallee and without her knowledge....

The generally accepted rule applicable to this situation is well stated in 17 Appleman, Insurance Law and Practice, Section 9401:

"An insurer cannot avoid a policy by taking advantage of a misstatement in the application, material to the risk, not due to the insured's bad faith. It is the duty of an agent for an insurance company to prepare the papers under his supervision so that they will accurately and truthfully state the results of the negotiations, and the agent's failure to do so is, in legal effect, the fault of the company.

\*   \*   \*   \*   \*   \*

This rule applies with particular force where the false answers are inserted by the agent without the knowledge of the applicant, regardless of whether such statements be considered representations or strict warranties. Thus, where an application is prepared without even consulting or interrogating the insured, and the insured had no knowledge of the making of such statements, much less their verity, an estoppel is certain to arise.

Likewise, an insurer waives or is estopped to rely on representations contained in an application where the agent fills in the application without propounding any of the questions to the insured."

*La Vallee*, 501 S.W.2d at 74.

In *Wunderlich* the insurer asked the trial court to cancel an automobile policy on the basis that a representation on the application was untrue—the representation being that the insured had no children. The insured admitted signing an application prepared by a secretary in the insurer's office, but he testified that the incorrect information was not on the application at the time he signed it. The secretary admitted that she did not specifically ask the insured how many children he had but, acting on the assumption he had none, wrote the numeral "0" in response to the question on the application. As does the insurer in the case now before us, the insurer in *Wunderlich* cited *Miller v. Plains Ins. Co.*, 409 S.W.2d 770 (Mo.App. 1966), as authority for declaring the policy void. The eastern district of the court of appeals rejected that argument, saying:

We do not find the law as set forth above to be applicable to the facts in the case at bar. This is not a case where the applicant failed to disclose or gave false answers. It is a case where the applicant gave the correct information to the agent of the insurance company who then made a mistake in preparing the application. In other words, the applicant did not make the mistake. The agent made the mistake, and his principal is bound by it and is estopped to assert it as a ground to void the policy under the circumstances here present.

. . . .

Such a state of facts falls within the rule adopted by our courts, which is so well stated in 45 C.J.S. Insurance § 729, p. 735, as follows:

"[T]he general rule is that where insured at the time of applying for the policy truthfully states to the agent the facts involved in the risk ... and the agent, acting within his real or apparent authority, and without the actual or constructive knowledge or collusion of the insured, inserts in the application or in the policy mistaken or intentionally false statements, the insurer cannot set up such misstatements in avoidance of the policy provided, according to some authorities, the policy would have been issued and been binding if the true answers as given by insured were set forth in the application.

"The rule applies whether the statements or answers are representations or warranties; and this is so although insured was present when the agent inserted the false statements."

*Wunderlich*, 447 S.W.2d at 3–4[1–3].

In *Sappington* the insurer defended a claim made on a life insurance policy asserting a material misrepresentation in the application—a representation concerning the insured's health that was false. The evidence indicated that the insured's agent filled out the application after asking the insured only her name, age, and beneficiary. The insured was then directed to sign the application and she did so. In reversing the trial court's judgment for the insurer, the western district said:

The statements contained in said application, except as to the name and the age of the insured and the name of the beneficiary therein, while nominally only those of the insured, must be taken, in fact, as statements of the defendant itself and cannot, under the circumstances, be held to be the statements of the plaintiff or of the insured. The knowledge of the agent with respect to the application and the questions and answers appearing and made thereon, as to whether such questions were in fact asked and such

answers were in fact made by the insured or as to the truthfulness or untruthfulness thereof, is imputed to the defendant and becomes the knowledge of the defendant....

77 S.W.2d at 147.

In *Macalco, Inc. v. Gulf Ins. Co.*, 550 S.W.2d 883 (Mo.App.1977), an insurer attempted to avoid its policy because of an alleged material misrepresentation on the application. In rejecting that attempt this court relied, in part, on *La Vallee, Wunderlich*, and *Sappington* and stated:

[A] misrepresentation depends not only upon falsity but upon what was known by the various parties. Generally, the knowledge of its agent is imputed to the insurer and if the agent is told the truth about a material matter by an innocent applicant, the insurer is bound by a false statement in the application. The insurer may be bound not only when the agent knows the truth, but when he is in a position where he should know the truth from the circumstances. A similar result obtains if the agent fills out the application without questioning the applicant.

*Macalco* at 894–95[14] (citations omitted).

Finally, in *Schnatzmeyer v. National Life Ins. Co.*, 791 S.W.2d 815 (Mo.App. 1990), an appellant, who claimed insurance coverage, argued that an agent's mistake waived the insurer's right to avoid the policy based on misrepresentations. The eastern district of the court of appeals held that no agent mistake existed because there was no evidence that the insured gave true answers which the agent changed nor was there any evidence that the application was completed without the insured's answering questions. *Id.* at 820[6]. However, the court in *Schnatzmeyer* acknowledged that material false statements on a signed application do not require that the policy be voided when an agent mistake exists.

Plaintiff misreads those authorities. [17 J. Appleman, *Insurance Law and Practice* § 9401 (1981); *Macalco; Young v. Ray Am., Inc.*, 673 S.W.2d 74 (Mo. App.1984); *La Vallee; Sappington.*]

None of those authorities suggest that it is a mistake simply because an agent did not ask the questions verbatim. *See, e.g.*, 17 *Appleman*, § 9401. Rather, as the title of the cited section of *Appleman* indicates, it concerns "Insertion of False Answers by Agent." For example, in the cited section, the author says that the "fact that the insured may have signed the application would not render him responsible for *false statements inserted by the agent* therein without his knowledge, where he had given truthful answers and had no reason to believe that they would be falsified by the company's representative." *Id.* (emphasis added [in *Schnatzmeyer* opinion]).

Thus, under the cases and the treatise cited by plaintiff, a mistake occurs either when the agent is given true answers but inserts erroneous ones without the knowledge of the insured or where the agent fills in the application without asking any of the questions.

*Schnatzmeyer*, 791 S.W.2d at 820[5].

It is undisputed that the plaintiff's signature appears on an application which contained false information. However, there was substantial evidence from which the jury could have concluded the false answers were added after the plaintiff signed the application and that they were the result of agent mistake and not the plaintiff's bad faith. Point II is rejected.

*False Swearing*

In Points I and III, the defendant focuses on the $4,281 payment it made to Phillip. In Point I, the defendant asserts it is entitled to a judgment as a matter of law "because plaintiff committed fraud upon the jury in that her own testimony showed there was a fraudulent double recovery in her claim." The defendant's claim that "plaintiff committed fraud upon the jury" rests on the following contentions: (a) The plaintiff included on her inventory items that belonged to Phillip, not her; (b) when Phillip submitted his separate list of items he claimed he lost in the burglary and theft, he included some of the items that were on the plaintiff's list; (c) the defendant paid Phillip for his alleged losses, be-

lieving him to be an "innocent spouse";[6] (d) after the plaintiff learned that the defendant had paid Phillip, she nevertheless did not remove from her list tools for which Phillip was paid and she did not reduce the dollar amount of her claim; and (e) her attempt to recover "nearly 25% more ... than one is entitled ... is clearly fraud."

The defendant does not explain its use of the term "fraud upon the jury." We assume the defendant equates "fraud upon the jury" with "false swearing" because it cites *Gould v. M.F.A. Mut. Ins. Co.*, 331 S.W.2d 663 (Mo.App.1960), in which Judge Stone said, "the 'false swearing' which will void an insurance policy must have been willful, with respect to a material matter, and with the intent to deceive the insurer." *Id.* at 669[7]. The *Gould* opinion continues:

> Where *plaintiffs-insureds* admit or their evidence conclusively shows false swearing (as hereinbefore defined), direction of a verdict for defendant-insurer is appropriate; but where the evidence is such that the triers of the facts may draw different inferences and may reach different conclusions on the issue of false swearing, the case should not be taken from the jury.

331 S.W.2d at 670[11] (citations omitted) (emphasis in original).

The evidence in this case falls in the latter category; it is such that the jury could have drawn different conclusions on the issue of false swearing because the evidence conflicted about who owned some, if not all, of the items for which Phillip was paid.

Although Phillip testified that he owned the items on his list, there was evidence from which the jury could have concluded he had disavowed ownership of any items on his list that also appeared on the plaintiff's list. The plaintiff's list was prepared prior to preparation of the proof of loss statement, which Phillip signed, and the dollar amount claimed on the proof of loss form differs by only sixty-eight cents from the total value of items on the plaintiff's list, after excluding the value of the recovered three-wheeler. More important, it is clear from the record that the defendant treated the proof of loss and the plaintiff's list as interdependent documents. Thus, the jury could have concluded that when Phillip joined the plaintiff in signing and swearing to the March 5, 1987, proof of loss form which stated that, at the time of the loss, the insured property belonged "to Shelia Sturgeon and no other person or persons had any interest therein except Paul Russell—Lisa Coatney," he was giving up any claim he might have had to all items on the plaintiff's list. Moreover, when he reviewed the plaintiff's list, he challenged the existence and age of several items, but he did not claim ownership of any, including those which later appeared on his separate list.

The jury also could have concluded that all of the items that were stolen from the shed belonged to the plaintiff by virtue of her agreement with Phillip. The plaintiff testified that "Phillip had come in and took his stuff that he wanted, and what was left was supposed to have been mine. That was our agreement...." We realize that all items that appear on both inventory lists were not tools; however, it cannot be assumed that the only items taken from the shed were tools.

There was substantial evidence adduced by the defendant—in addition to Phillip's testimony—that would have permitted the jury to conclude the plaintiff did, indeed, lie on the proof of loss statement and her list of missing or damaged property. However, the jury was not compelled to embrace the defendant's witnesses and their testimony. *Gould,* 331 S.W.2d at 670[10]. Jurors are free to disregard or disbelieve whatever facts are inconsistent with their conclusion. *DeWitt v. American Family Mut. Ins. Co.,* 667 S.W.2d 700, 709 n. 7 (Mo.banc 1984). Jurors may believe or disbelieve, accept or reject, any part of the oral testimony even though it be uncontroverted. *Gould,* 331 S.W.2d at 670[10]. Where, as here, there is evidence that supports a finding that the plaintiff owned the

---

6. The defendant calls our attention to *Haynes v.*      *Hanover Ins. Co.,* 783 F.2d 136 (8th Cir.1986).

items subsequently claimed by Phillip, the defendant cannot, by voluntarily paying Phillip for some of the items on the plaintiff's list, compel the conclusion, as a matter of law, that the plaintiff was falsely swearing when she continued to pursue her claim for all the items on her list. Point I is without merit.

*Credit for Payment to Phillip*

■ In Point III the defendant contends that the trial court erred when it failed to reduce the jury's verdict by the sum of $4,281, the amount paid to Phillip, "because plaintiff is entitled to only one recovery in that the award given by the jury included items that had been previously claimed by [Phillip] and compensation therefore paid to him." The defendant argues that "it is undisputed that the Proof of Loss submitted by Plaintiff contains items which belonged to her ex-husband, and for which he received compensation. . . ." The plaintiff should not be paid for those items, the defendant argues, because "the most the policy ever entitled the insureds, if enforceable, was but one recovery for items lost."

To support its argument, the defendant points to the principle that a party cannot be compensated for the same injury twice, and it calls our attention to *Ross v. Holton*, 640 S.W.2d 166, 173[12] (Mo.App.1982), and *Stix & Co. v. First Mo. Bank & Trust Co.*, 564 S.W.2d 67, 70[8] (Mo.App.1978). It also cites *Weeks–Maxwell Const. Co. v. Belger Cartage Serv.*, 409 S.W.2d 792 (Mo.App. 1966), in which the court quoted with approval the following passage from 25 C.J.S. *Damages* § 3 at 627–28:

> As a general rule, a person who has sustained loss or injury may receive no more than just compensation for the loss or injury sustained. He is not entitled to

be made more than whole, and he may not recover from all sources an amount in excess of the damages sustained, or be put in a better condition than he would have been had the wrong not been committed.

409 S.W.2d at 796[4].

The principles enunciated in *Ross, Stix,* and *Weeks–Maxwell* are inapplicable here. As earlier discussed, there was conflicting evidence about who owned the items that appeared on both Phillip's list and the plaintiff's list. The jury resolved that conflict in favor of the plaintiff by awarding her the full amount of her claim; it did not award her more than she claimed and offered evidence on.

■ The principles of *Ross, Stix,* and *Weeks–Maxwell* prohibit multiple recovery by a single claimant for a single injury; they *do not* protect a defendant from the possibility of multiple payments for a single injury where there are multiple claimants and the defendant settles with one claimant prior to resolving the conflicting claims. By settling with Phillip and obtaining his assistance in defending against the plaintiff's claim, the defendant took the risk that a jury might believe the plaintiff and not Phillip. Because the record supports a conclusion that there was no double recovery by the *plaintiff*, the defendant's argument is without merit. Point III is denied.

*Penalty for Vexatious Refusal to Pay*

■ The defendant's final two points relate to the jury award of damages and attorney fees for vexatious refusal to pay pursuant to § 375.296 and § 375.420, RSMo 1986.[7] In Point IV, the defendant contends

7. § 375.296 provides in part:

In any action, suit or other proceeding instituted against any insurance company . . . upon any contract of insurance . . . if the insurer has failed or refused for a period of thirty days after due demand therefor prior to the institution of the action, suit or proceeding, to make payment under and in accordance with the terms and provisions of the contract of insurance, and it shall appear from the evidence that the refusal was vexatious and without reasonable cause, the court

or jury may, in addition to the amount due under the provisions of the contract of insurance and interest thereon, allow the plaintiff damages for vexatious refusal to pay and attorney's fees as provided in section 375.420.

Under § 375.420, the court or jury may, in addition to awarding the plaintiff the amount of the loss plus interest,

allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hun-

the plaintiff did not make a submissible case on the issue of vexatiousness "in that she failed to present proof of lack of reasonable cause on the part of the [defendant] in denying the claim."

■ To support the imposition of the statutory penalty, the insured must show that the insurer's refusal to pay the loss was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person before trial. *Groves v. State Farm Mut. Auto. Ins. Co.*, 540 S.W.2d 39, 42[1] (Mo.banc 1976). The phrase *before trial* in *Groves* (and numerous other opinions) is significant because the fact that the trial judgment is adverse to the insurer's contention is not sufficient reason to impose the statutory penalty. *Id.* at 42[2]; *Katz Drug Co. v. Commercial Standard Ins. Co.*, 647 S.W.2d 831, 839[8] (Mo.App.1983). Thus, whether a refusal to pay is vexatious or not must be determined by the situation as presented to the insurer at the time it was called on to pay. *Adams v. State Auto Ins. Ass'n of Des Moines*, 265 S.W.2d 738, 741[5] (Mo.App.1954). However, an insurer that persists in its refusal to pay after it becomes aware that it has no meritorious defense is subject to penalty for vexatious refusal. *Ireland v. Manufacturers & Merchants Indemnity Co.*, 298 S.W.2d 529, 534[8] (Mo.App.1957).

The supreme court has provided guidance for determining whether evidence supports a vexatiousness award:

> The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant. Direct and specific evidence to show vexatious refusal is not required[;] the jury may find vexatious [delay] upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case.

*DeWitt*, 667 S.W.2d at 710[31, 32]. This language from *DeWitt* has been characterized as having relaxed the standard necessary to support a vexatiousness award. *Allen v. State Farm Mut. Auto. Ins. Co.*,

753 S.W.2d 616, 620 (Mo.App.1988); *Hester v. American Family Mut. Ins. Co.*, 733 S.W.2d 1, 2[3] (Mo.App.1987).

■ Examples of evidence of vexatiousness include a refusal to pay based on an inadequate investigation and a denial of liability without stating any ground for denial. *Allen*, 753 S.W.2d at 620[2, 3]. Certainly circumstances exist where an insurance company's reliance on its own investigation and that of law enforcement agencies can provide it a reasonable basis for delaying or refusing payment of a claim. *Id.* at 621. However, where there is evidence that the insurer's reliance on the results of an investigation is not reasonable, the question is for the jury. *Allen*, 753 S.W.2d at 621[4]; *see also DeWitt*, 667 S.W.2d at 710[32]. Moreover, the insurer's stated grounds for refusal must be reasonable. *See, e.g., Berry v. Federal Kemper Ins. Co.*, 621 S.W.2d 948 (Mo.App.1981), in which the court examined the evidence related to the reason given by the insurer for denying coverage and described that reason as "tenuous at best." *Id.* at 954[21].

Here, the defendant, in addition to relying on the investigation conducted by law enforcement officials, conducted its own extensive investigation into the circumstances surrounding the plaintiff's claim. The defendant also provided the plaintiff (and Phillip) with a detailed letter setting out the reasons for denying the claim. These actions alone, however, do not cause the defendant to prevail as a matter of law, for there was evidence that permitted the court to submit the issue of vexatiousness to the jury.

The first reason stated by the defendant in its denial letter of August 14, 1987, for rejecting the claim was that the plaintiff and Phillip had lied on the application. Prior to issuing the denial letter, the defendant had in its possession two versions of the typed application: the agent's copy on which the answer lines for two questions were blank and the original on which handwritten answers to those two questions appear. The defendant also was aware that

dred dollars and a reasonable attorney's fee. . . .

the Ziegenhorn agency's former secretary had refused to talk about the facts surrounding the application, but the defendant investigated that matter no further. From this evidence the jury could have found lacking both the defendant's investigation about the application and its explanation in its August 14 letter that it was denying coverage because of misrepresentations on the application.

Concerning some of the other reasons set out in the denial letter, the jury could have concluded from the defendant's disparate treatment of the plaintiff and Phillip that the defendant's refusal to pay the plaintiff was, in the language of the statute and the cases, "without reasonable cause." The defendant paid Phillip on his claim without requiring receipts; the defendant remained steadfast in its refusal to pay the plaintiff in the absence of such documentation, even after it received all the receipts the plaintiff could locate. The defendant paid Phillip even though there is no evidence in the record that Phillip recanted his sworn statement that the items on the plaintiff's list belonged to the plaintiff or Paul Russell or Lisa Coatney or his false statement on the proof of loss form that he and the plaintiff had not suffered a prior loss by burglary, theft, or robbery.

This disparate treatment appears based on the defendant's conclusion that Phillip was telling the truth and the plaintiff was lying, or, as the defendant asserted under its Point I on appeal, that Phillip was the "innocent spouse." The defendant relies solely on *Haynes*, 783 F.2d 136, as authority for its apparent position that Missouri should allow an innocent insured to recover under an insurance policy despite misconduct by another insured under the same policy. In *Haynes*, the Eight Circuit Court of Appeals, after citing numerous cases from jurisdictions other than Missouri, opined, "We think the better view and the position more likely to be adopted by the courts of Missouri when the question is addressed is expressed in the latter line of authority permitting recovery by an innocent co-insured." 783 F.2d at 138.

The validity of the prediction of the *Haynes* court was questioned in *Childers v. State Farm Fire & Cas. Co.*, 799 S.W.2d 138, 141 (Mo.App.1990). We recognize that the *Childers* opinion was not issued until approximately one year after the plaintiff filed her petition in the case now before us. Nevertheless, the case authority that caused the *Childers* court to question the *Haynes obiter dicta* was available to the defendant at the time it made its determination of Phillip's innocence.

Whether the innocent co-insured doctrine should be adopted in this state is not the issue before us, and we offer no opinion on whether it should be. Nevertheless, we make two observations. First, we note that court decisions that accept or reject application of the doctrine frequently are based on a determination that the innocent co-insured had interests in the property which were separate and distinct from the interests of the guilty insured. *See* Jane M. Draper, Annotation, *Theft and Vandalism Insurance: Coinsured's Misconduct as Barring Innocent Coinsured's Right to Recover on Policy*, 64 A.L.R.4th 714 (1988); Larry D. Scheafer, Annotation, *Right of Innocent Insured to Recover under Fire Policy Covering Property Intentionally Burned by Another Insured*, 11 A.L.R.4th 1228 (1982); D.E. Evins, Annotation, *Fraud, False Swearing, or Other Misconduct of Insured as Barring Recovery on Property Insurance by Innocent Coinsured*, 24 A.L.R.3d 450 (1969).

Our second observation from our review of the cases is that where, as here, an insured's guilt or innocence and the respective interests of co-insureds in the property are matters in dispute, resolution is for the trier of fact, be it judge or jury. An insurer that undertakes to resolve a dispute over guilt or innocence and the insureds' respective interests in the property must bear the risk that the trier of fact might not only disagree with the insurer's decision but might also find the insurer's decision did not provide it with reasonable cause to refuse payment of the claim.

The question before us, then, is whether the jury could have concluded the defen-

dant had reasonable cause to refuse payment to the plaintiff based on its embrace of the "innocent co-insured" doctrine, its decision that Phillip was, indeed, an "innocent spouse," and its determination that the property for which he was paid was his alone. On the record before us, the jury might have concluded that the defendant's refusal, based on such conclusions, was unreasonable. Alternatively, the jury might have concluded that the defendant did not, in fact, believe Phillip was "innocent" and did not adequately investigate the issue of ownership of the property for which he was paid, but simply paid his claim in exchange for his testimony against the plaintiff.

Concerning the plaintiff's refusal to sign the tendered authorization forms for release of information, the jury could have found that, given their purpose, the authorizations were too broad, and that it was unreasonable of the defendant to require their execution by the plaintiff as a condition of payment of her claim.

Regarding the investigation of the plaintiff's possible involvement in the burglary and theft, we recognize that prosecuting attorneys have broad discretion in determining whether to pursue criminal charges, and we realize the standards of proof in a criminal case and in a vexatious refusal case are different. Nevertheless, on the facts before us, it was for the jury to determine whether the defendant was reasonable in its continuing refusal to pay the plaintiff's claim based on the initial belief that she was involved in the burglary. The police investigation apparently ended in February 1987, and no charges were ever filed. The defendant, through its investigator, had maintained regular contact with police Lt. Armour during his investigation and received information from him on a regular basis. Despite this ready access to police information, there is no evidence in the record that, during the two and one-half year period between the apparent end of the police investigation and the filing of the petition, the defendant sought additional information about the police investigation and whether Lt. Armour still seriously considered the plaintiff a suspect, and there is no evidence that the defendant at any time reevaluated its belief that the plaintiff was involved.

In its denial letter, the defendant told the plaintiff and Phillip that it would reconsider the claim upon execution of the authorizations and "full compliance with all reasonable requests that we make of you." We have already stated our opinion that the jury could have found the request for authorizations unreasonable because of their breadth. Claims attorney Carroll admitted the plaintiff had supplied some receipts to document ownership and that receipts were not required of all claimants at all times. The plaintiff said she had provided all the receipts she could locate and informed the defendant that not all receipts were available. Thus the jury could have concluded the defendant, despite its statement in its denial letter that it would reconsider the plaintiff's claim, did not sincerely do so, choosing rather to cling unyieldingly to the position it had adopted in August 1987. The reasonableness of its apparent refusal to reconsider the plaintiff's claim was for the jury.

Although it is true that the issue of vexatious refusal must be determined at the time the insurer is called on to pay, *Adams*, 265 S.W.2d at 741, this is not a case in which an insured, having been denied in her claim, had no additional contact with the insurer until her petition was served. The defendant here was "called on to pay" on more than one occasion. The plaintiff persisted in her claim and supplied additional information to support it. Certainly, the plaintiff's persistence and the additional information she provided did not, as a matter of law, require the defendant to relent and pay her claim. The on-going nature of the claim, however, created a jury question about whether the defendant ever reevaluated the merits of the defenses it set out in its August 14, 1987, denial letter.

Applying the guidelines set out in *De-Witt*, 667 S.W.2d at 710, we conclude the jury, from "a general survey and a consideration of the whole testimony and all the facts and circumstances," could have found

the defendant's refusal to pay the claim was willful and without reasonable cause. Thus, the trial court did not err in submitting the issue to the jury. We reject Point IV.

*Attorney Fees for Vexatious Refusal to Pay*

 We reach a different result on the issue of attorney fees, a matter challenged in the defendant's Point V. The only evidence on the subject came in this exchange between the plaintiff and her attorney:

> Q. What was the fee arrangements for my services with you?
>
> A. One-third.
>
> Q. So if you don't get anything, I don't get anything?
>
> A. Yes, that's correct.

To recover the attorney fees authorized by §§ 375.296 and 375.420, the claim must be supported by appropriate pleadings, and the allegations must be sustained by proof. *Fay v. Aetna Life Ins. Co.*, 268 Mo. 373, 187 S.W. 861, 865 (1916). *See also Hawkeye–Security Ins. Co. v. Davis*, 277 F.2d 765, 771 (8th Cir.1960). It is error to submit the question of attorney fees under the statute where there is no evidence in the record showing the reasonable value of the attorney's services. *Fay*, 187 S.W. at 865. *See also Williams v. United Ins. Co. of America*, 618 S.W.2d 229, 233 (Mo.App. 1981), and *City of Aurora v. Firemen's Fund Ins. Co.*, 180 Mo.App. 263, 165 S.W. 357, 362 (1914) (To satisfy the statute the fee must be reasonable and it must be based on evidence.).

The plaintiff admits she finds no cases which support her claim that proof of the existence of a contingent percentage fee contract is sufficient to satisfy the requirements of the statute. Our research likewise reveals no such cases.[8]

However, we do not decide whether testimony about the existence of a contingent percentage fee contract is sufficient to satisfy the statute in all cases. We simply hold that no showing of a reasonable attor-

ney fee was made here. While a trial court is an expert on the value of legal services, *Ozark Production Credit Ass'n v. Walden*, 695 S.W.2d 919, 922[2] (Mo.App.1985), a jury is not, *Howard Const. v. Teddy Woods Const.*, 817 S.W.2d 556, 564[18] (Mo.App.1991). The record before us contains no evidence from which the jury could have determined the amount of a reasonable attorney fee. The trial court erred in submitting the issue of attorney fees to the jury.

We reverse the award of attorney fees. In all other respects, we affirm the judgment.

MAUS and MONTGOMERY, JJ., concur.

---

8. It appears a contingency fee arrangement was involved in *Victor v. Manhattan Life Ins. Co.*, 772 S.W.2d 826 (Mo.App.1989). However, the sufficiency of the evidence to show the reasonableness of the fee was not an issue in *Victor*.